UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AARON BRAXTON III, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01052-JMS-MJD |
| | ) | |
| INDIANAPOLIS PUBLIC SCHOOLS, | ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>ORDER</u>**

Plaintiff Aaron Braxton III, a former maintenance technician, was hired as a Construction Trades Teacher for Defendant Indianapolis Public Schools (the "<u>School</u>") from 2019 to 2021.  After two years of difficulties teaching, including issues with classroom management and student safety, the School decided not to renew his employment contract.  Mr. Braxton ultimately sued, alleging that the School unlawfully discriminated against him on the basis of his disability (anxiety), and that the School unlawfully retaliated against him by terminating him for reporting alleged harassment on the basis of his disability.  The School has filed a Motion for Summary Judgment, [Filing No. 40], which is ripe for the Court's consideration.

**I.**
**STANDARD OF REVIEW**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of*

1

*Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).

Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

Before recounting the material facts in this action, the Court addresses the parties' filings. The School argues that Mr. Braxton's Response to the Motion for Summary Judgment "fails to conform" with Local Rule 56-1. [Filing No. 43 at 2.] The School argues that Mr. Braxton has not adequately cited to the record, did not submit his exhibits before filing his brief, and did not properly lay out a section of facts. [Filing No. 43 at 2-3.]

Local Rule 56-1(e) requires the non-movant's response to "include a section labeled 'Statement of Material Facts in Dispute.'" Mr. Braxton's section is labeled "Facts/Evidence." [Filing No. 42 at 1.] Even if the Court looked to the substance of that section and not only its label, that section does not include any disputes about material facts or any dispute of historical facts at all. [Filing No. 42 at 1-2.] Instead, the section provides only a list of exhibits, which were not filed before his response as required by the Court's Practices and Procedures. [Filing No. 42 at 1-2; Filing No. 6 at 4 (Practices and Procedures).] Local Rule 56-1(f)(1) provides that "the court will assume that . . . the facts as claimed and supported by admissible evidence by the movant are admitted without controversy except to the extent that . . . the non-movant specifically controverts the facts in that party's 'Statement of Material Facts in Dispute' with admissible evidence" or "the facts . . . allow the court to draw reasonable inferences in the non-movant's favor sufficient to preclude summary judgment." Having provided counsel with multiple reminders of the Court's Practices and Procedures, [Filing No. 6; Filing No. 21], there is little good cause to excuse non-compliance. The Court thus primarily recounts the facts consistent with the School's version of events. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (affirming summary

judgment against plaintiff who did not comply with S.D. Ind. Local Rule 56-1 and "did not make any effort to identify with specificity what factual issues were disputed, let alone supply the requisite citations to the evidentiary record").  In any event, there appears to be little dispute as to material historical facts, but rather the legal significance of those facts, as the Court's analysis will demonstrate.

The following Statement of Facts is set forth pursuant to the standard detailed above and Mr. Braxton's failure to comply with Local Rule 56-1.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.      The Parties

The School is a "public school corporation charged with the education of approximately 30,000 of Indianapolis' urban youth in grades K-12." [Filing No. 41 at 3.]  It operates four high schools and "over 70 primary and middle schools." [Filing No. 41 at 3.]

As of 2012, Mr. Braxton was the School's utilities maintenance technician.  [Filing No. 40-1 at 71-72 (Mr. Braxton's resume).]  Before then, Mr. Braxton was employed broadly in the trades, including roofing, painting, electrical repair work, managing inventory and parts, and the like. [Filing No. 40-1 at 71-72.]  Mr. Braxton did not have prior experience teaching.  [*See* Filing No. 40-1 at 71-72.]

In 2019, the School hired Mr. Braxton into Arsenal Technical High School's Career and Technical Education program to be its Construction Trades Teacher.  [Filing No. 40-2 at 12-13.] Mr. Braxton's direct supervisor was Career Academy Coordinator Chelsa Thompson, who was

functionally the Assistant Principal.  [Filing No. 40-1 at 2.]  Ms. Thompson reported directly to Arsenal Tech's Principal, Corye Franklin ("Principal Franklin").  [Filing No. 40-1 at 2.]

### B.    The School's Expectations for Its Teachers

Ms. Thompson was responsible for evaluating the performance of teachers under her supervision, including Mr. Braxton.  [Filing No. 40-1 at 2-3.]  Those evaluations included "periodic scheduled classroom visits – some longer, some shorter – as well as impromptu or ad hoc classroom visits and group meetings."  [Filing No. 41 at 4 (citing Filing No. 40-1 at 2-3).]  Ms. Thompson "regularly documented her scheduled observations using structured metrics corresponding to those used in the teacher's formal annual performance evaluations."  [Filing No. 41 at 5 (citing Filing No. 40-1 at 2-3).]  The School states that its "teacher evaluations are meant to encompass not only the multiple formal metrics reflected on the form but also other observations captured in the 'comments' section."  [Filing No. 41 at 5 (citing Filing No. 40-4 at 8-9).]  In general, teachers are evaluated using a standardized Employee Effectiveness Rubric across four domains: (1) planning and preparation; (2) classroom environment; (3) instruction; and (4) professional responsibilities.  [E.g., Filing No. 40-1 at 21 (Mr. Braxton's final evaluation).]  The School states that it applies a different rubric to "experienced teachers as compared to novice teachers (that is, those who are new to the profession, whether hired externally or from a non-teaching position within [the School])."  [Filing No. 41 at 5 (citing Filing No. 40-1 at 3).]

### C.    Mr. Braxton's First Year Teaching

Early on, in January 2020, Ms. Thompson observed that Mr. Braxton "ha[d] immense potential."  [Filing No. 40-1 at 25.]  But there were indications that his classroom management and organization needed improvement: for example, Ms. Thompson noted that "[s]ome students [were] having their own side conversation."  [Filing No. 40-1 at 24.]  Nonetheless, Ms. Thompson recognized Mr. Braxton's efforts, stating that she "appreciate[d] [his] energy and enthusiasm for

[his] position," and that he had "some excellent ideas, and [had] contributed in large ways already in [his] short time with [the School]."  [Filing No. 40-1 at 28.]  She asked how she could support Mr. Braxton and his class further.  [Filing No. 40-1 at 28.]

As time went on, in what the School describes as a "persistent and increasingly troublesome trend," Ms. Thompson discovered that students in class were not "properly using protective equipment in [Mr. Braxton's] classroom after [Ms. Thompson] observed them using power tools or performing other hands-on activities without appropriate protective equipment such as safety goggles, earplugs, gloves, etc." [Filing No. 41 at 6 (citing Filing No. 40-1 at 4; Filing No. 40-4 at 47-48; Filing No. 40-4 at 51-54.)]  But given that it was Mr. Braxton's first year, Ms. Thompson allowed room for improvement, evaluating him on his end-of-year review as "effective."  [Filing No. 40-1 at 11-12.]

### D.   Mr. Braxton's Second Year Teaching

#### 1.   *Mr. Braxton's Continued Struggles with Classroom Management and Other Performance Metrics*

Mr. Braxton entered his second year of teaching in the Fall of 2020, during the COVID pandemic.  [Filing No. 40-1 at 4-5.]  Consequently, Mr. Braxton had to manage social distancing, hybrid learning, and wearing masks.  [Filing No. 40-1 at 4-5.]  He also was expected to serve as a role model for a new teacher, Mr. Jason Hochstedler.  [Filing No. 40-4 at 16-17.]

During the Fall 2020 semester, Ms. Thompson observed "the same types of concerns with [Mr. Braxton's] performance."  [Filing No. 40-1 at 5.]  On September 30, 2020, she admonished Mr. Braxton to avoid using class time on off-topic matters like politics, and reminded him that he was behind on entering his grades into the School's system.  [Filing No. 40-1 at 31.]  On October 29, 2020, Ms. Thompson reminded Mr. Braxton that he should be providing hands-on activities for students on each day of class.  [Filing No. 40-1 at 76.]  On November 16, 2020, Ms. Thompson

observed that students were asleep in his class and Mr. Braxton was not providing hands-on projects for students. [Filing No. 40-1 at 78.] On November 30, 2020, Ms. Thompson informed Mr. Braxton that he had not submitted a required checklist. [Filing No. 40-1 at 79.] On January 29, 2021, Ms. Thompson noted that some students "ha[d] earbuds in, [and] two [were] in the classroom not participating," and one student was not wearing protective goggles. [Filing No. 40-1 at 40-41.] On March 1, 2021, Ms. Thompson emailed Mr. Braxton to place him on a Performance Improvement Plan focusing on his "Planning and Preparation" in the classroom. [Filing No. 40-1 at 16-19.] Mr. Braxton's performance improvement plan concerned "planning and preparation" because his teaching had demonstrated a "[l]ack of intentional planning [and] lack of precise leaning objectives determined for daily instruction[,] [r]esult[ing] in loss of productive instructional time." [Filing No. 40-1 at 16.] But ten days into his Performance Improvement Plan, Mr. Braxton indicated that he did not know he was on one. [Filing No. 40-1 at 16.] He said he must have stopped reading Ms. Thompson's email before reaching the end of the page. [Filing No. 40-1 at 16.]

On March 18, 2021, Ms. Thompson documented that there were two students with no masks. [Filing No. 40-1 at 47.] And on May 5, 2021, Ms. Thompson noted that of six students in class, three were on their phones, and three were on their laptops. [Filing No. 40-1 at 57.] There was no instructor supervision. [Filing No. 40-1 at 57.] One of Mr. Braxton's required classroom documents had not been updated and was still the one created by Ms. Thompson "multiple months ago," which seemingly had no connection to the current project. [Filing No. 40-1 at 58.] From these observations, Ms. Thompson noted that "[t]he physical environment is unsafe or some students don't have access to learning. There is poor alignment between the arrangement of furniture and resources, including computer technology, and the lesson activities." [Filing No. 40-

1 at 63.]  She stated that "[s]afety precautions were not being honored" and asked "[w]hy are students not wearing safety goggles and allowed to have masks down?"  [Filing No. 40-1 at 64.]  Ms. Thompson later testified that she saw "children using saws" who "need[ed] to wear protective eyewear.  It is my job to keep students safe.  It is my job to point out when they are not safe.  Saws without eyewear are not safe."  [Filing No. 40-4 at 51.]

Principal Franklin also learned of Mr. Braxton's challenges in the classroom, noting that Mr. Braxton "posted a photo of a student performing class work on social media, and the photo plainly showed the student not wearing the required face mask."  [Filing No. 41 at 10 (citing Filing No. 40-3 at 51-53; Filing No. 40-3 at 64-66.)]

<em>2.    Mr. Braxton's Dispute and Classroom Disruption with a Fellow Teacher over Automotive Repair Work</em>

Sometime in the Fall of 2020, Mr. Braxton brought a van to campus for another teacher, Mr. George Mitchell, to work on in connection with automotive classes that Mr. Mitchell taught.  [Filing No. 40-2 at 29-31.]  There was apparently an ongoing dispute about payment for van repair that "trickled on for awhile."  [Filing No. 40-4 at 22-23.]  On March 9, 2021, Mr. Mitchell and another teacher entered Mr. Braxton's classroom during an ongoing class to look for tools.  [Filing No. 40-2 at 44-46, 52-55.]  Mr. Braxton stated that he asked Mr. Mitchell to leave because he did not trust him; that Mr. Mitchell refused to leave; that Mr. Braxton asked his co-teacher Mr. Hochstedler to watch Mr. Mitchell; and that Mr. Mitchell then called Mr. Braxton an expletive.  [Filing No. 40-2 at 39-40.]  The entire dispute unfurled in full view of students during class.  [Filing No. 40-2 at 39-40.]

Ms. Thompson and Principal Franklin were upset about the dispute.  [Filing No. 40-1 at 9.]  They called in Mr. Braxton and Mr. Mitchell for a meeting and recommended that they let the dispute go.  [Filing No. 40-1 at 9.]  During the meeting, Mr. Braxton cried, and Mr. Franklin

allegedly commented that Mr. Braxton would benefit from counseling. [Filing No. 40-2 at 90-94.] Both Mr. Mitchell and Mr. Braxton received the same kind of written warning for the dispute. [Filing No. 40-3 at 83 (Mr. Braxton's written warning); Filing No. 40-3 at 84 (Mr. Mitchell's written warning).] Mr. Mitchell's warning included the additional instructions that "if there is a need for Mr. Mitchell or any member on his team to retrieve or get materials from any other place on campus, an email, indicating the need shall be sent, in advance." [Filing No. 40-3 at 84.]

Mr. Braxton later characterized himself as "an embarrassment" for Principal Franklin, noting that Mr. Braxton "couldn't let go of the money situation. I know that was making [Principal] Franklin upset." [Filing No. 40-3 at 44-45.] Mr. Braxton acknowledged that he could not let go of his dispute with Mr. Mitchell: "I know that was making [Principal Franklin] upset, but I had been done wrong . . . I had been done wrong, been lied on, and I just wanted the situation to be handled. . . . I just got mistreated and it's just done and over with . . . . I didn't want that. That — I mentally — that just mentally — I don't know if it's just me or not, but it just doesn't sit with me and it — it messed with me." [Filing No. 40-3 at 45.]

### 3. Mr. Braxton's Final Evaluation

Mr. Braxton's final evaluation was worse than his first. On a 4-point scale, he received the following scores: In planning and preparation, Mr. Braxton received a 1.67. [Filing No. 40-1 at 21.] In classroom environment, he received a 1.60. [Filing No. 40-1 at 21.] In instruction, he received 1.60. [Filing No. 40-1 at 21.] And in professional responsibilities, he received his lowest score, a 1.17. [Filing No. 40-1 at 21.] Although his first evaluation overall scored a 3.1, his final evaluation scored a 1.56:

| Employee Effectiveness Rubric (EER) | Rating | Weight | Weighted Rating |
|---|---|---|---|
| Domain 1: Planning and Preparation | 1.67 | X 0.100 | 0.17 |
| Domain 2: Classroom Environment | 1.60 | X 0.400 | 0.64 |
| Domain 3: Instruction | 1.60 | X 0.400 | 0.64 |
| Domain 4: Professional Responsibilities | 1.17 | X 0.100 | 0.12 |
| Final EER Score | | | 1.56 |

[Filing No. 40-1 at 21; Filing No. 40-1 at 11-12 (first evaluation)]

**E.      The School's Non-Renewal of Mr. Braxton's Teacher Contract**

On May 10, 2021, Principal Franklin informed Mr. Braxton that "[d]espite having been provided support and multiple opportunities to improve instructional planning, compliance with school and district expectations, and [his] overall teaching performance, [he had] failed to demonstrate sufficient improvement in [his] teaching responsibilities as directed by administration and per [his] job description."  [Filing No. 40-3 at 93.]

Principal Franklin wrote to the School Superintendent a synopsis of his concerns prompting his recommendation of non-renewal:

> [Mr. Braxton] has not demonstrated effective or strong teaching for the period observed, which causes concerns for a professional in this setting.
>
> Based on [Mr. Braxton's] observations this year . . . I am not convinced that [Mr. Braxton] has the skills or ability to manage a classroom or facilitate effective quality instruction.  There have been multiple instances of students sleeping, on their cell phones, and disengaged during lessons.
>
> Additionally, [Mr. Braxton] has missed professional deadlines, [including] completing checklists and other professional tasks.
>
> A typical day in [Mr. Braxton's] classroom consists of students engaging in tasks, but with little to no regard for safety protocols. . . .  [Mr. Braxton] has also had several negative encounters with co-workers that have led to administrative intervention."

[Filing No. 40-3 at 99 (non-renewal documentation).]

10

The Board of School Commissioners agreed, while still acknowledging Mr. Braxton's efforts: "The Board also finds that it was clear that Mr. Braxton cared very much for the success of his students.  Mr. Braxton exhibited passion for high school students and for their mastery of the construction trades.  Mr. Braxton had his students' best interests in mind and demonstrated positive relationships with his students." [Filing No. 40-3 at 104.]  Mr. Braxton was terminated as of June 18, 2021.  [Filing No. 40-3 at 103.]

### F.     Mr. Braxton Files Suit

On December 15, 2021, Mr. Braxton filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that the School unlawfully discriminated against him on the basis of his disability and unlawfully retaliated against him for "reporting workplace harassment." [Filing No. 40-3 at 107.]  On February 24, 2023, the EEOC issued Mr. Braxton a Notice of Right to Sue Letter.  [Filing No. 1-2 at 9.]  On May 23, 2023, Mr. Braxton filed suit in the Marion Superior Court, setting forth claims under the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") for discrimination and retaliation.  [Filing No. 1-2 at 5-6 (alleged claims); Filing No. 1-1 at 2 (state-court docket).]  The School later removed the case to this Court.  [Filing No. 1.]  The School has filed a Motion for Summary Judgment, [Filing No. 40].

### III.
#### DISCUSSION

### A.     ADA Discrimination Claims

#### *1.     Wrongful Termination*

The School argues in support of its Motion for Summary Judgment that to prove discrimination under the ADA, Mr. Braxton must show that he is disabled, but in this case, Mr. Braxton is not actually disabled.  [Filing No. 41 at 23.]  The School states that to show that Mr.

Braxton is disabled, he must show that he is "substantially limited in a major life activity." [Filing No. 41 at 23.]  The School argues that Mr. Braxton must show that his condition "significantly restricted [his] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." [Filing No. 41 at 24-25.]  It asserts that Mr. Braxton has not provided evidence from "documentation," "provider testimony," or "any medical professional" to show that he has anxiety and depression. [Filing No. 41 at 23-24.]  The School avers that while Mr. Braxton's perceptions of his experience may be "real and . . . unpleasant," he "describes in general terms something experienced by nearly every worker in nearly every profession in stressful workplace situations that inevitably arise from time to time." [Filing No. 41 at 24.]  The School asserts that "unpleasant feelings that come from dealing with one specific coworker, even when couched in self-diagnosed and quasi-medical terms like 'stress' and 'anxiety' are not a substantial limitation within the meaning of the ADA," so Mr. Braxton's negative response to his dispute with fellow teacher Mr. Mitchell does not count. [Filing No. 41 at 25.]

Mr. Braxton argues that his anxiety and depression "affected his professional performance," [Filing No. 43 at 8], rendering him actually disabled, having a record of being disabled, and being regarded as disabled. [Filing No. 42 at 3-6.]  As to actual disability, Mr. Braxton argues that he has "provided sufficient evidence that he suffers from anxiety which substantially limits one or more major life activities," including his ratings for "Generalized Anxiety Disorder." [Filing No. 42 at 4.]  According to Mr. Braxton, his medical records "confirm that his anxiety and depression affected him mentally," such as "significantly restrict[ing] his ability to let go of situations that had been mishandled or where he had been wronged." [Filing No. 42 at 4.]  Among those situations, Mr. Braxton includes the "unfair treatment by" the School, which significantly "impacted his

mental health" by causing "emotional distress." [Filing No. 42 at 4.] Mr. Braxton argues that he also has a record of being disabled. [Filing No. 42 at 5.] He notes that he confided in Principal Franklin during multiple "informal conversations about life hardships," including "mentions of his mental health conditions such as anxiety and depression." [Filing No. 42 at 5.] Mr. Braxton states that "[a]lthough he did not state his condition formally the context of these discussions made it apparent to the employer that the plaintiff was experiencing mental health issues." [Filing No. 42 at 5.] For example, Mr. Braxton states that he had an "emotional breakdown," during which time Principal Franklin made a comment about seeking "counseling." [Filing No. 42 at 6.] Finally, Mr. Braxton argues that he was regarded as disabled. [Filing No. 42 at 6.] He states that Principal Franklin and Ms. Thompson "knew of his anxiety and depression due to their close professional relationship and discussions about personal issues." [Filing No. 42 at 6.] Mr. Braxton states that "[d]espite not formally declaring his anxiety and depression, Mr. Braxton's mental health struggles were evident and communicated to his supervisors." [Filing No. 42 at 6.]

The School replies that Mr. Braxton's inability to "let go of situations that had been mishandled or where he had been wronged" does not establish that he was disabled. [Filing No. 43 at 10.] The School argues that Mr. Braxton has shown "at most" that "his limitations were specific to a certain individual with whom he had a specific source of conflict, which does not qualify as a disability under the ADA." [Filing No. 43 at 11.] The School argues further that "[t]o have a record of disability, a plaintiff must show he 'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" [Filing No. 43 at 8.] But in this case, the School argues, Mr. Braxton has at most a record of "telling people he has a history of anxiety and depression." [Filing No. 43 at 8.] The School states that each mention of "anxiety" and "stress" in Mr. Braxton's telehealth records really comes from

only what Mr. Braxton reported himself, not from an official diagnosis.  [Filing No. 43 at 7.]  In contrast, the School states it "cannot locate a single instance anywhere in those records where any third party purports to 'rate' or otherwise convey any belief that [Mr. Braxton] has any cognizable medical condition."  [Filing No. 43 at 7.]  The School notes further that Mr. Braxton's "records from telehealth services" were rendered only "after his separation" from the School.  [Filing No. 43 at 7.]  The School argues that the records are "unauthenticated and rife with inadmissible hearsay" and that general "conversations with a supervisor" do not "constitute historical evidence of a substantial limitation."  [Filing No. 43 at 7-8.]  Finally, as to whether Mr. Braxton's supervisors "regarded" him as disabled, the School points to Mr. Braxton's own contrary testimony, in which he stated, "I don't know if I ever came out and said . . . I have anxiety, I have depression. . . . I'm a man, so I probably didn't.  I tried to keep my business to myself as much as possible."  [Filing No. 43 at 9.]  Even if Mr. Braxton had more specific conversations with his supervisors, the School argues that Mr. Braxton is not able to "testify as to what others knew or believed," [Filing No. 43 at 9], so "reporting stressful circumstances does not . . . mean an employer must have thereafter considered the employee to be 'impaired.'"  [Filing No. 43 at 11.]

The ADA, as amended, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to discharge of . . . employees."  42 U.S.C. § 12112(a).  "To prove a violation of § 12112(a), a plaintiff must show that: . . . he is disabled."  *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017).  "Under the ADA, the term 'disability' means that an individual has: (1) a physical or mental impairment that substantially limits one or more 'major life activities'; (2) a record of such impairment; or (3) being regarded as having such an impairment."  *Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015) (quoting 42 U.S.C. § 12102(1)).  The term "substantially limits" compares "the ability of an

14

individual to perform a major life activity [versus] most people in the general population.   An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.   Nonetheless, not every impairment will constitute a disability." 29 C.F.R. § 1630.2(i)-(ii).

Mr. Braxton does not make clear which of his major life activities are substantially impaired by his anxiety and depression.   He argues only generally how his anxiety substantially limits "one or more major life activities."   [Filing No. 42 at 4.]   His most specific argument is with reference to how his anxiety had "affected his professional performance."   [Filing No. 43 at 8].   For purposes of analysis, then, the Court assumes that Mr. Braxton argues his mental health impairments substantially limit his major life activity of "working." 42 U.S.C. § 12102(2)(A).

For mental health conditions, the Seventh Circuit has generally "distinguished between . . . personal conflicts with others, or mere temperament and irritability, . . . and medically diagnosed mental conditions," *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1059 & n.9, n.10 (7th Cir. 1998), such as substantially limiting anxiety and depression. *See, e.g.*, *Gile v. United Airlines, Inc.*, 95 F.3d 492, 494 (7th Cir. 1996) (ruling in favor of disabled employee diagnosed with a "depressive reaction in anxiety state").   This distinction is key to resolving Mr. Braxton's claim.   For example, Mr. Braxton focuses on his negative experiences with fellow teacher Mr. Mitchell and the way the School handled their dispute.   But "a personality conflict with a supervisor or coworker does not establish a disability within the meaning of disability law." *Palmer v. Cir. Ct. of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997).   And being "substantially limited in the major life activity of working" does not include "a substantial limitation in performing the unique aspects of a single specific job," such as experiencing anxiety from interacting with specific individuals on the job, like Mr. Braxton's dispute with Mr. Mitchell.

*Carothers*, 808 F.3d at 1147-48 (quoting 29 C.F.R. § 1630 Appendix) (affirming summary judgment against employee whose anxiety flared up while engaging with juveniles at work).

Likewise, Mr. Braxton may well have become more stressed because he was reprimanded for the dispute with Mr. Mitchell and given general work criticism, but "[t]he major life activity of working is not 'substantially limited'" due to "anxiety and stress related to his [supervisor's] review of [his] job performance." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996) (affirming summary judgment against employee with anxiety).  To Mr. Braxton's credit, it is true that under the ADA, a person may be "regarded as" disabled "because of an actual or perceived . . . mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011) (quoting 42 U.S.C. § 12102(3)).  So it is relevant that Principal Franklin might have commented that Mr. Braxton would benefit from counseling, discussed Mr. Braxton's hardships with him, and permitted him to take a sick day for his mental health.  Nonetheless, those conversations and alleged acknowledgements fall short of worse remarks that are insufficient to "show[] even a perception of a mental impairment that substantially limits one or more major life activities." *Stewart v. Cnty. of Brown*, 86 F.3d 107, 111 (7th Cir. 1996) (affirming summary judgment against employee as being regarded as disabled even though the employer "ordered . . . psychological evaluations for him" and stated he was "emotionally or psychologically imbalanced"); *see also Wells v. Winnebago Cnty., Ill.*, 820 F.3d 864, 867 (7th Cir. 2016) (affirming summary judgment against employee who "relied exclusively on the many times she told supervisors about her anxiety").

Beyond Mr. Braxton's work experiences, he supports his claim of disability with his therapy records.  Even assuming that those records are not hearsay, they would not offer support.  That is because an employee's disability is "determined as of the time of the employment decision."

16

*Weiler*, 101 F.3d at 524.  The matter of timing presents a problem here: Mr. Braxton's records describe his mental health struggles before and after his employment, but not during his employment.  The therapy notes do show high scores for depression and anxiety, but the earliest documentation is from 2022, a year after his termination.  [Filing No. 42-1 at 13.]  The therapy notes indicate that he had a history of therapy in childhood and adolescence, but that was years before his termination.  [Filing No. 42-1 at 10.]  The most contemporaneous assessment states that Mr. Braxton struggled "since 2017 specifically after the death of his mother, [which] increase[d] . . . depression/anxiety after [the] loss of [his] father in 2019."  [Filing No. 42-1 at 10.]  As unfortunate as Mr. Braxton's familial losses are, a general assessment of grief alone does not specifically describe how he is substantially limited in his ability to work.  Indeed, "[m]any people suffer anxiety without being disabled by it."  *Wells*, 820 F.3d at 867 (affirming summary judgment against employee whose "medical evidence [did not] back up her contention that her disability adversely affected her ability to" work).  Ultimately, Mr. Braxton's therapy notes are effectively a retroactive diagnosis, which does not shine light on any substantial limitations "as of the time of the employment decision."  *Weiler*, 101 F.3d at 524.

No reasonable juror could find that Mr. Braxton was disabled under the ADA.  Without a finding of disability, Mr. Braxton's discrimination claim for wrongful termination cannot succeed.  The Court **GRANTS** the School's Motion for Summary Judgment, [Filing No. 40], as to Mr. Braxton's disability discrimination claim for wrongful termination.

### 2.    *Failure to Accommodate*

The School did not address a failure-to-accommodate claim in its Motion for Summary Judgment, but Mr. Braxton argues in his Response that he has asserted such a claim and that the School's "failure to accommodate [his] anxiety . . . constituted discrimination under the ADA."  [Filing No. 42 at 8.]  He argues that "[u]nder the ADA, employers are required to provide

reasonable accommodations to employees with known disabilities unless it causes undue hardship." [Filing No. 42 at 8.] He asserts that he "requested that his interactions with a particular co-worker," presumably Mr. Mitchell, "be managed to avoid unnecessary stress, but this was not effectively resolved, leading to increased anxiety." [Filing No. 42 at 9.] He states that "prior to his termination," the School should have "offered the opportunity" to apply for another "custodial job available," for which he was "overwhelmingly qualified." [Filing No. 42 at 9.]

The School argues in its Reply that Mr. Braxton has not "preserved any failure-to-accommodate claim." [Filing No. 43 at 4.] The School states that Mr. Braxton did not "clearly assert a claim in a Statement of Claims," resulting in "abandonment of that claim." [Filing No. 43 at 4.] Even if the claim were preserved, the School argues, Mr. Braxton "cannot establish that he was a qualified individual with a disability, nor that [the School] was aware of his disability," or that the School "failed to reasonably accommodate him." [Filing No. 43 at 4-5.] The School argues that employees "must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor, before an employer may be required under the ADA's reasonableness standard to provide a specific accommodation." [Filing No. 43 at 5.] The School states that "[w]hile [Mr. Braxton] may have made various references to stress and anxiety in communications with his supervisors, he never presented substantiating documentation, and he never linked those references to work in a way that reasonably suggested he was seeking 'accommodation' for any substantial impairment." [Filing No. 43 at 6.] The School states that it "did manage the situation" between Mr. Braxton and Mr. Mitchell "decisively as soon as it learned that [Mr. Braxton] and his colleague were incapable of keeping their personal dispute from disrupting their work:  both were disciplined and told unequivocally to 'let it go.'" [Filing No. 43 at 6-7.] The School notes that

18

thereafter, Mr. Braxton "reported no further problems with" Mr. Mitchell, and that Mr. Braxton "thanked his supervisors for addressing the situation." [Filing No. 43 at 7.]

The Court first begins with whether Mr. Braxton waived his claim for failure to accommodate. In ADA cases, the Seventh Circuit has imposed waiver when "nowhere in [the plaintiff's] complaint [were] there facts to put [the defendant] on notice that [the plaintiff] was alleging failure to accommodate." *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 851 (7th Cir. 2015) (imposing waiver on failure-to-accommodate claim). In this case, however, Mr. Braxton "allege[d] a claim for discrimination under the ADA, and ADA discrimination includes a failure to accommodate." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (holding failure-to-accommodate claim was preserved where complaint "pled a number of facts relevant to his failure-accommodate-claim"). Mr. Braxton argued to the EEOC that "a reasonable employer would have offered him a position similar to his previous position." [Filing No. 40-3 at 113.] Additionally, Mr. Braxton asserted in his "Burden of Proof Statement" – which the Court understands to be Mr. Braxton's "Statement of Claims" required by the Court's Case Management Plan – that the School "lacked a legitimate business reason to terminate Mr. Braxton because at the time of [his] termination as a teacher, there were positions that he qualified for based upon his previous position as a maintenance worker and he was not offered the position." [Filing No. 36 at 2.] This is the same argument he makes in his response to the School's Motion for Summary Judgment. [Filing No. 42 at 9.] Consequently, the Court holds that Mr. Braxton's failure-to-accommodate claim is not waived.

Nonetheless, his claim cannot succeed. A prerequisite for a failure-to-accommodate claim is that Mr. Braxton have a disability. *Li v. Fresenius Kabi USA, LLC*, No. 23-3286, 2024 WL 3648287, at *3 (7th Cir. Aug. 5, 2024) (observing that the ADA "proscribes discrimination against

a 'qualified individual on the basis of disability.'") (quoting 42 U.S.C. § 12112(a)).  As the Court has analyzed above, no reasonable jury could find that Mr. Braxton was disabled.  Even if he were disabled, Mr. Braxton "has not offered medical evidence demonstrating that a reasonable employer would understand every mention of [his] anxiety as a disability." *Wells*, 820 F.3d at 867 (affirming summary judgment against employee's failure-to-accommodate claim).  And to receive an accommodation in the form of a job transfer, "the individual must . . . satisfy the legitimate prerequisites for that alternative position." *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998).  Yet when Ms. Thompson was asked whether Mr. Braxton would have been "qualified for a position as a custodian," she answered that "[w]ith the campus that he had disrupted heavily, that would not have made sense."  [Filing No. 40-4 at 57-59.]  The Court **GRANTS** the School's Motion for Summary Judgment, [Filing No. 40], as to Mr. Braxton's failure-to-accommodate claim.

### B.    Disability Retaliation

The School argues that Mr. Braxton "never engaged in protected activity," so his retaliation claim fails. [Filing No. 41 at 26.] It states that general complaints are not the same as "complaining that [a] coworker had discriminated against [him] 'because of [his] disability.'" [Filing No. 41 at 26-27.] Applying that rule, the School argues that Mr. Braxton "complained to his supervisors about perceived 'harassment' by" Mr. Mitchell, "but he never said or implied anything reasonably suggesting that [Mr.] Mitchell allegedly directed harassing conduct at [him] because of a disability." [Filing No. 41 at 28.] The School also argues that Mr. Braxton "cannot demonstrate any causal connection between his separation and any protected category or conduct." [Filing No. 41 at 28.] The School states that Mr. Braxton must show that the School's "decision not to renew his contract was motivated by . . . his disability or his allegedly protected complaint about disability-based harassment." [Filing No. 41 at 28.] The School states that on the contrary, "there

is no evidence that anyone at [the School] was upset at [Mr. Braxton] or harbored any negative feelings towards him for having any kind of mental health condition." [Filing No. 41 at 29.] To the extent that Principal Franklin remarked that Mr. Braxton would benefit from professional counseling, the School asserts that "such a remark reflects no anti-disability animus but rather an accurate observation coupled with a reasonable suggestion." [Filing No. 41 at 29-30.] If Ms. Thompson and Principal Franklin were upset with Mr. Braxton, it was solely because his dispute with Mr. Mitchell erupted into a "dramatic and disruptive display in front of students." [Filing No. 41 at 31.] The School states that Mr. Braxton's performance reviews had lower scores, not because of his complaints about Mr. Mitchell, but because of the documented "problems with . . . lesson planning and concerns over students not paying attention and not utilizing safety gear properly on repeated occasions throughout his second academic year teaching." [Filing No. 41 at 32.] The School argues that any other miscellaneous "retaliatory discharge" claim about reporting "[w]orkplace harassment" "must be grounded in an activity protected by a particular statute," and in this case, there is none. [Filing No. 41 at 33-34.]

Mr. Braxton responds that the School unlawfully retaliated against him on the basis of his disability. [Filing No. 42 at 10.] He states that he engaged in the "protected activity" of "requesting reasonable accommodations for his disability" and "reporting . . . workplace harassment and threats." [Filing No. 42 at 10.] He asserts that he "requested a meeting with school administrators . . . to address issues arising from Mr. Mitchell's behavior, which included harassment and disruption of his classroom," but Ms. Thompson disregarded him by telling him to "let it go." [Filing No. 42 at 11.] He asserts further that he was harassed by Mr. Mitchell when Mr. Mitchell "entered [his] classroom without permission, disrupted his teaching, and made threatening comments." [Filing No. 42 at 12.] Mr. Braxton states that when he "reported these incidents to

Ms. Thompson and Principal Franklin," they "discouraged him from filing formal complaints." [Filing No. 42 at 12.] After engaging in his allegedly protected activity, Mr. Braxton states that he "suffered adverse employment actions," including a "negative evaluation," and despite a performance improvement plan, "[t]ermination." [Filing No. 42 at 13-14.]

The School replies that protected activity "must be 'more than simply a complaint about some situation at work, no matter how valid the complaint might be.' The complaint instead must indicate discrimination on the basis of membership in a protected class." [Filing No. 43 at 11.] In applying this rule, the School states that Mr. Braxton "never told (nor even claims to have told) [the School] that he believed [Mr.] Mitchell was mistreating him on the basis of a disability." [Filing No. 43 at 11-12.] The School reiterates that it terminated Mr. Braxton's employment, not because of any purported disability, but because of Mr. Braxton's "consistent and consistently documented failings in lesson planning, classroom administration, safety practices, and other key metrics used in [the School's] teacher evaluation rubrics across two academic years." [Filing No. 43 at 12.]

"An employee bringing a retaliation claim against an employer must present evidence of '(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Li*, 2024 WL 3648287, at *6 (7th Cir. Aug. 5, 2024) (quoting *Adebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022)). To satisfy causation, an employee must show that "the record contain[s] sufficient evidence to conclude that retaliatory motive caused the materially adverse action." *Li*, 2024 WL 3648287, at *6 (quoting *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022)). As it pertains to the behavior of employees, "employers must control the behavior of others in the workplace, so as to ensure nondiscriminatory working conditions." *Wells*, 820 F.3d at 865.

22

Regarding the confrontation between Mr. Braxton and Mr. Mitchell, the evidence shows only a dispute between coworkers, not harassment of a disabled employee.  When asked whether "Mr. Mitchell harassed [Mr. Braxton] because of [his] disabilities," Mr. Braxton answered, "I don't know why he did that." [Filing No. 40-3 at 43.]  When asked whether Mr. Mitchell "knew [he] was disabled," Mr. Braxton answered, "I couldn't answer that." [Filing No. 40-3 at 43.]  When asked whether he ever even spoke with Mr. Mitchell about his mental health concerns, Mr. Braxton was unsure, stating that "we definitely talked about hardships in life," but "I mean, I don't know if I ever came out and said, you know, I have anxiety, I have depression.  I don't know if I've ever said that.  I'm a man so I probably didn't." [Filing No. 40-3 at 43-44.]

As to allegedly retaliating by not handling the dispute to Mr. Braxton's liking, the School did, in fact, handle the dispute.  The School called both teachers in.  The School disciplined both teachers.  Both Mr. Mitchell and Mr. Braxton received the same kind of written warning for the dispute.  [Filing No. 40-3 at 83 (Mr. Braxton's written warning); Filing No. 40-3 at 84 (Mr. Mitchell's written warning).]  Additionally, Mr. Mitchell's warning included instructions that "if there is a need for Mr. Mitchell or any member on his team to retrieve or get materials from any other place on campus, an email, indicating the need shall be sent, in advance." [Filing No. 40-3 at 84.] This would have the practical effect of preventing Mr. Mitchell from entering Mr. Braxton's classroom for tools without prior permission.

As to allegedly retaliating by not providing an accommodation generally, the Court reiterates its earlier analysis that no reasonable jury could find that Mr. Braxton was disabled and if he was, he was required to "make [his] employer aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor, before an employer may be required under the ADA's reasonableness

standard to provide a specific accommodation." *Wells*, 820 F.3d at 867. The record shows that no reasonable jury could find that Mr. Braxton met this requirement.

Mr. Braxton argues that his reporting the alleged harassment preceded his decline in performance reviews, which reflects suspicious timing. In general, "'temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter' without additional facts." *Li*, 2024 WL 3648287, at *6 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012)). "Loose temporal proximity . . . . is not enough." *Id.* (affirming summary judgment against employee's retaliation claim). A "case based on suspicious timing is particularly weak where a plaintiff's protected activity follows 'a performance warning for the very same conduct that ultimately led to his termination.'" *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 496 (7th Cir. 2014) (affirming summary judgment against ADA discrimination claim where employee was warned for tardiness and ultimately terminated for tardiness). In this case, Mr. Braxton's reasons for termination included the documented history of problems from the beginning of his tenure. Ms. Thompson testified that "keeping an organized, productive, efficient classroom . . . was never his strong suit from the beginning." [Filing No. 40-4 at 16.] In addition to extensive documentation, Ms. Thompson testified that Mr. Braxton "had two school years to figure out what he was doing and had a lot of support and training to do it." [Filing No. 40-4 at 12.] But ultimately, when asked whether "students learn[ed] in Mr. Braxton's class," Ms. Thompson answered, "[n]ot often enough." [Filing No. 40-4 at 47.] Ms. Thompson explained that "the deficiencies [she] observed in his performance would have been equally concerning regardless of whether they were caused by a medical condition or any other reason." [Filing No. 40-1 at 10.] She stated that she would have evaluated

Mr. Braxton's performance negatively "in the exact same manner even if [she] was aware that he had a mental health condition." [Filing No. 40-1 at 10.]

No reasonable juror could find that the School unlawfully retaliated against Mr. Braxton based on a disability. The Court **GRANTS** the School's Motion for Summary Judgment, [Filing No. 40], as to Mr. Braxton's retaliation claim.

## IV.
### CONCLUSION

Ultimately, "[n]ot every personal discomfort nor workplace embarrassment rises to the level of a recognized disability." *Weiler*, 101 F.3d at 526. There is a distinction between the routine emotional ups and downs of the working world, and the debilitating effects of substantially limiting depression and anxiety. The evidence shows that Mr. Braxton is a skilled tradesman, but as a classroom teacher, he fell short of the School's legitimate expectations. The Court recognizes that Mr. Braxton cares about students. The School, too, cares about its students, and the School determined that it was in the best interest of the students that the School and Mr. Braxton part ways. This is not the outcome either party originally intended, but it is an outcome permitted by law. The Court **GRANTS** the School's Motion for Summary Judgment as to all of Mr. Braxton's claims. [40.] Final judgment shall enter accordingly.

Date: 8/14/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Joseph C. Pettygrove
KROGER GARDIS & REGAS LLP
jpettygrove@kgrlaw.com

Hamidullah Saahir
Hamid Saahir & Associates PLLC
hamid@hurt317.com

Aaron J. Williamson
Kroger Gardis & Regas, LLP
AWilliamson@kgrlaw.com